UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS KABROVICH,

                Plaintiff,                    Case No. 19-11564

v.                                    Paul D. Borman
                                    United States District Judge

KEVIN MCALEENAN, Acting Secretary
Department of Homeland Security, and
Commissioner, United States Customs
and Border Protection,

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 23) AND DIRECTING THE CLERK OF COURT TO AMEND THE DOCKET TO REFLECT THE PROPER DEFENDANTS

On May 28, 2019, Plaintiff Nicholas Kabrovich filed a Complaint in this lawsuit against Defendant Kevin McAleenan, Acting Secretary Department of Homeland Security, and Commissioner, United States Customs and Border Protection,[1] asserting four claims: (1) Count I – Disability Discrimination - ADAA;

---

[1] The Court notes that Kevin McAleenan is the former Acting Secretary of the Department of Homeland Security. The proper current Defendants are: Alejandro Mayorkas, Secretary of Homeland Security, and Troy Miller, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection. The Clerk of Court is directed to amend the docket for this case to reflect the proper Defendants. The caption shall read: "Nicholas Kabrovich v. Alejandro Mayorkas,

1

(2) Count II – Retaliation - ADAA; (3) Count III – Disability Discrimination – Rehabilitation Act of 1973; and (4) Count IV - Retaliation – Rehabilitation Act of 1973. (ECF No. 1, Complaint.)

Plaintiff filed an Amended Complaint on September 27, 2019, dropping his claims under the Americans with Disabilities Act and now asserting three claims for: (1) Count I - Disability Discrimination – Rehabilitation Act of 1973; (2) Count II - Retaliation – Rehabilitation Act of 1973; and (3) Count III – Judicial Review of the Initial Decision of the Merit Systems Protection Board. (ECF No. 12, FAC.)

In this employment discrimination case, Plaintiff Nicholas Kabrovich, a former United States Customs and Border Protection Officer, asserts claims under the Rehabilitation Act of 1973 that he was discriminated against based on an alleged disability (Count I), and retaliated against for engaging in protected activity (Count II). He also seeks judicial review of an adverse ruling on these issues and his termination by the Merit Systems Protection Board ("MSPB") (Count III). Now before the Court is Defendant's Motion for Summary Judgment (ECF No. 23). The motion is fully briefed. The Court held a hearing using Zoom videoconference technology on February 26, 2021, at which counsel for Plaintiff and Defendant

---

Secretary of Homeland Security, and Troy Miller, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection."

appeared. For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

#### 1.    Plaintiff's employment and allegations of mistreatment

Plaintiff Nicholas Kabrovich ("Plaintiff") was employed as a United States Customs and Border Protection Officer ("CBPO") from 2009 to June 2018. (ECF No. 12, Plaintiff's First Amended Complaint ("FAC") ¶ 21, PgID 60.) Plaintiff claims that he had been diagnosed with a learning disability and attention deficit hyperactivity disorder ("ADHD") prior to his employment with Customs and Border Protection ("CBP"), but that he does not recall disclosing those conditions when he applied for the CBPO position. (ECF No. 23-2, Ex. 1, Deposition of Nicholas Kabrovich ("Kabrovich Dep.") at pp. 15, 27, PgID 170, 173.)[2] Plaintiff states that he may have told a few coworkers and a union representative about his conditions once he was working, and claims that these conditions made it harder for him to do his job and that he worked slower than others. (*Id.* at pp. 40-46, PgID 176-78.) However, Plaintiff states that he performed his job well and always received successful

---

[2] Defendant's Exhibits are identified by numbers ("1, 2, 3, ...") and Plaintiff's Exhibits are identified by letters ("A, B, C, ...").

performance reviews. (ECF No. 30-2, Ex. A, Deposition of Port Director Devin Chamberlain ("Chamberlain Dep.") at pp. 113-14, PgID 1439.)

After going through academy training, Plaintiff was assigned to the Detroit Metropolitan Airport where he began onsite training. (Ex. 1, Kabrovich Dep. at p. 34, PgID 175; FAC ¶ 22, PgID 60.) Plaintiff alleges that he was harassed starting in 2009, while he was still in training. (Ex. 1, Kabrovich Dep. at pp. 49, 73-74, PgID 179, 185.)

Plaintiff asserts that supervisory CBPO Christopher Anaya harassed him starting in 2009 by allegedly yelling at him for the way he conducted a baggage exam. (*Id.* at p. 49, PgID 179.) Anaya later became Plaintiff's rating supervisor, responsible for Plaintiff's performance reviews, sometime in 2012. (*Id.* at pp. 51-52, PgID 179.) According to Plaintiff, Anaya continued to harass him by criticizing his work performance, including "[t]elling me to earn my pay; yelling at me. It appears that he was always trying to find a way to get me into trouble, or to embarrass me. Denying me a union representative," and assigning him to work in a less desirable position. (*Id.* at pp. 53-55, PgID 180.) Plaintiff believed Anaya was "disparaging" him and that Anaya thought Plaintiff was "lacking" and less deserving of respect, although Plaintiff did not hear Anaya make statements like that. (*Id.* at pp. 57-58, PgID 181.)

4

Plaintiff admits that Anaya never formally disciplined him. (*Id.* at p. 56, PgID 180.) Plaintiff also does not recall Anaya ever referring to Plaintiff's conditions (ADHD and/or learning disability) or that he had a disability or was "different," or otherwise making disparaging comments about people with disabilities in general. (*Id.* at pp. 62-63, 78, PgID 182, 186.) Plaintiff acknowledges that Anaya was known as a "bad ass." (*Id.* at p. 63, PgID 182.) Anaya was described by others as "fair but firm," and that he did not treat Plaintiff more harshly than other officers. (ECF No. 23-4, Ex. 3, Beverly Guinn Declaration ("Guinn Decl."), ¶ 10, PgID 363; ECF No. 23-5, Ex. 4, Michael Berney Declaration ("Berney Decl."), PgID 364.)

Plaintiff also alleges that he was told at some time by a coworker that other officers called him "Special K" and "T-Rex," and that he heard a supervisor once refer to him as "T-Rex" over the speakerphone. (Ex. 1, Kabrovich Dep. at pp. 65-66, 70-71, 77-78, PgID 183-84, 186.) Plaintiff interpreted these names as referring to his disabilities. (*Id.*) A coworker, CBPO Beverly Guinn, described Plaintiff as "lacking in social skills," and said that some people teased him "for his odd behavior and mannerisms," but that she "did not witness anyone teasing him on the basis of any medical conditions or disability." (Ex. 3, Guinn Decl., ¶¶ 4-5, PgID 362-63.) Guinn stated that the name "T-Rex" referred to the way Plaintiff "carried his arms when he walked." (*Id.* ¶ 6, PgID 363.)

On February 24, 2016, Plaintiff complained to management that Anaya had ordered him out of his booth and yelled at him in front of other CBPOs and passengers. (ECF No. 23-9, Ex. 8, Kabrovich 2/24/16 Letter to Watch Commander Aaron Witt, PgID 712.) Plaintiff complained that Anaya denied him union representation and he claimed that Anaya's manner and criticism "created a hostile work environment." (*Id.*) Plaintiff stated that Anaya "has unfairly singled [him] out for over six years" and claimed that Anaya "plans to hurt [him] professionally, and possibly bring physical harm to [him]." (*Id.*) He also stated that he has "been working with Union Representation for months to find a peaceful solution to this problem, but it has only become worse" and that "in the last two or so months, management has kept [them] separate." (*Id.*) Plaintiff admits that this letter does not mention any disability, and that he did not complain in that letter that his coworkers were harassing him or that Anaya's alleged actions were based on Plaintiff's disabilities. (*See id.*; Ex. 1, Kabrovich Dep. at pp. 93-94, PgID 190.)

On March 25, 2016, Anaya was issued a Cease and Desist letter from Port Director Chamberlain, instructing him to "immediately cease and desist any contact with [Plaintiff]," including contact by "email, phone, cell phone, work phone or in person." (ECF No. 23-11, Ex. 10, Cease and Desist Letter, PgID 716.) Anaya was also removed as Plaintiff's ratings supervisor, and Plaintiff reported that after the

6

cease and desist letter, most of his interactions with Anaya stopped. (Ex. 1, Kabrovich Dep. at p. 88, PgID 188; ECF No. 23-3, Ex. 2, MSPB Hearing Transcript 12/7/18 ("MSPB Tr. II"), at pp. 239-40, PgID 348-49.) Despite the alleged conflict between the two, Anaya never gave Plaintiff a poor performance rating or issued discipline against him during the time he was Plaintiff's supervisor. (Ex. 1, Kabrovich Dep. at pp. 56, 84-85, PgID 180, 187-88.)

In March of 2016, as a result of Plaintiff's allegations of harassment, an independent investigation was ordered. The independent investigator, Chief Adam Streetman, interviewed Plaintiff, Anaya, and several of Plaintiff's co-workers, and then issued a written report in late 2016 (hereinafter, the "Streetman Report"). (ECF No. 23-10, Ex. 9, Streetman Report, PgID 713-15.) During the investigation, Streetman "discovered that [Plaintiff] became physically intimidated and afraid of SCBPO Anaya throughout his interaction with him from 2014 to present." (*Id.* PgID 714.) Streetman also heard from several officers, including Anaya, that Plaintiff was described as "different" and sometimes exhibited "atypical" behavior, and that "many Officers within the Port pick on and/or make disparaging comments about [Plaintiff]," and some would "simply leave and [sic] area when [Plaintiff] entered and would not speak or interact with [Plaintiff]." (*Id.*) Anaya provided emails to Streetman noting performance issues and unusual behavior by Plaintiff that had been

7

reported to him. (*Id.*; ECF No. 23-12, Ex. 11, Anaya-Provided Emails, PgID 717-29.)

Streetman concluded that "the allegation[s] of harassment and hostile work environment have been substantiated" because Anaya's behavior was intimidating to Plaintiff, and his co-workers acted unprofessionally "by making disparaging comments and spreading rumors about [Plaintiff] in violation of the Standard of Conduct." (Ex. 9, Streetman Report, PgID 714.) However, Streetman subsequently stated in a June 29, 2020 declaration that Plaintiff never stated to him that he had a learning disability or ADHD, or that he felt he was being harassed "because he has a disability." (ECF No. 23-14, Ex. 13, Streetman Decl. ¶ 5, PgID 734.) Streetman explained that none of the people he interviewed mentioned that Plaintiff had a disability, and that he interpreted their comments that Plaintiff was "different" or "atypical" as meaning that Plaintiff "was odd, not that he was disabled." (*Id.* ¶¶ 6-7, PgID 734.) At the conclusion of Streetman's Report, he wrote that "[t]he Port has taken steps to mitigate any further interaction between SCPBO Anaya and [Plaintiff], which seems to have remedied much of [Plaintiff's] concern." (Ex. 9, Streetman Report, PgID 715.) Plaintiff agreed that he did not have any substantive interaction with Anaya after May 2016. (ECF No. 23-3, MSPB Tr. II, at pp. 239-40, PgID 348-49.) As a result of the investigation, Anaya was issued a written reprimand

8

for "unprofessional conduct" on November 10, 2016. (ECF No. 23-13, Ex, 12, Anaya Letter of Reprimand, PgID 730-32.)

On December 22, 2016, Plaintiff referred a passenger for a secondary-level screening, but he did not escort that passenger to the secondary screening, in violation of the Port 3807 FITRUN Referral Procedure, and the passenger never arrived for the secondary screening. This matter was investigated, and Plaintiff subsequently received a written reprimand on May 19, 2017. (ECF No. 23-15, Ex. 14, Kabrovich Letter of Reprimand, PgID 735-37.)

In January of 2017, Plaintiff filed an EEO Complaint, Case No. HS-CBP-00681-2017, alleging that Anaya and other CBPOs discriminated against him and subjected him to a hostile work environment because of his learning disability, and retaliated against him for complaining about the harassment. (See ECF No. 25-1, Ex. 15, 2017 Final Agency Decision ("FAD"), PgID 917.) Plaintiff amended this Complaint a number of times over the next year. (ECF Nos. 30-3 to 30-8, Exs. B-G, PgID 1457-1561.)

A Final Agency Decision by the U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties ("CRCL"), was rendered on this EEO charge on December 2, 2019 (after Plaintiff's termination), finding that Plaintiff failed to prove by a preponderance of the evidence that CBP discriminated against

him. The Decision stated that Plaintiff "did not provide any information that management's explanations and denials were untrue" and thus "he is unable to show that his mental disability or EEO activity motivated the complained-of actions against him." (Ex. 15, 2017 FAD, PgID 925.) The Decision also found that Plaintiff's hostile work environment claim failed because, "although the Supervisory CBP Officer may have subjected [Plaintiff] to some unwelcome conduct, the record did not show that [Plaintiff] was subjected to unwelcome conduct based on his membership in a protected class." (*Id.* PgID 928.)

### 2.   Plaintiff's mental health treatment/complaints

Plaintiff testified that he began receiving mental health treatment in August 2016, and he started treating with Dr. Ruma Hopkins in October 2016. (Ex. 1, Kabrovich Dep. at p. 104, PgID 192; ECF No. 30-7, Ex. F, Hopkins 3/13/17 Letter, PgID 1500; ECF No. 30-13, Ex. L, Deposition of Ruma Hopkins, M.D. ("Hopkins Dep."), p. 10, PgID 1716.) On August 26, 2016, Plaintiff filed a worker's compensation claim with the Department of Labor ("DOL"), asserting that he had developed an adjustment disorder with anxiety due to the alleged harassment by his supervisor and a hostile work environment. (ECF No. 23-17, Ex. 16, DOL Letter, PgID 740.)

10

On March 28, 2017, Plaintiff requested three weeks of advance sick leave, from April 5-26, 2017. (See ECF No. 23-18, Ex. 18, Chamberlain 4/6/17 Letter, PgID 743.) His treating physician, Dr. Ruma Hopkins, wrote on April 3, 2017, that Plaintiff "was off work on 3/21/17 and 3/27/17 because of a flare up of his symptoms," and that "he should stay off work from 4/5/17 to 4/26/17 and return to work on 4/27/17 because of the on-going severity of his symptoms." (ECF No. 23-17, Ex. 17, Hopkins 4/3/17 Letter, PgID 742.)

Port Director Devin Chamberlain then sent a letter to Plaintiff dated April 6, 2017, asking Plaintiff to have his physician provide additional medical information on his current health and fitness and on his ability to perform his duties as a CBPO. (ECF No. 23-18, Ex. 18, Chamberlain 4/6/17 Letter, PgID 743.) A copy of Plaintiff's position description as a CBP Officer was attached to the letter, and the letter requested "[w]ritten confirmation from your physician, that they reviewed the provided position description and the functional tasks and requirements essential to the position." (*Id.* PgID 744.) The letter identified specific questions to be addressed by Plaintiff's physician, including "[t]he impact of the medical condition(s) and/or the use of any prescribed medications on your overall health and daily activities, specifically addressing your ability to possess/utilize a firearm, thereby ensuring the safety of yourself and others." (*Id.* at PgID 743-44 (emphasis in original).) The letter

11

requested a response by April 21, 2017, and advised that "the failure to provide the supporting medical documentation, or incomplete medical documentation, may result in scheduling you for a mandatory Fitness for Duty Examination [("FFDE")]." (*Id.* at PgID 744.)

On April 10, 2017, Plaintiff submitted a Family and Medical Leave Act ("FMLA") request for leave, signed by Dr. Hopkins. (ECF No. 23-19, Ex. 19, FLMA Request, PgID 755-58.) This request stated that Plaintiff was unable to perform "any and all job functions," and described his condition as "anxiety – severe at times – poor concentration and attention – fatigue – agitation – dysphoric mood – sleep disturbance – nervous – depressed." (*Id.* at PgID 756.) Dr. Hopkins noted that Plaintiff's condition would cause "episodic flare-ups," which she estimated would happen once a month, lasting one to two days, and that these flare-ups would prevent Plaintiff from performing his job because of "anxiety – poor concentration – trouble focusing – agitation – nervous - depressed," and that it was medically necessary for him to be absent from work during a flare-up. (*Id.* at PgID 757.)

Just two days later, on April 12, 2017, Dr. Hopkins wrote in a letter that "[t]here is no recommendation for any specific work restrictions for [Plaintiff]." (ECF No. 23-20, Ex. 20, Hopkins 4/12/17 Letter, PgID 759.) Dr. Hopkins stated that Plaintiff had diagnoses of "Adjustment disorder with mixed anxiety and depressed

12

mood, Attention deficit hyperactivity disorder (ADHD) and learning disability," and that his symptoms include "anxiety, difficulty with concentration, problems with sleep, irritability and low energy." (*Id.*) Dr. Hopkins wrote that Plaintiff's "medications have been helpful in ameliorating some of his symptoms but he has been having more anxiety symptoms including anxiety attacks and sleep problems for the past few weeks…." (*Id.*) Dr. Hopkins recommended "medication management on a monthly basis." (*Id.*) She states that Plaintiff "has never expressed any thoughts or displayed any behavior concerning for self harm or being a danger to anyone else." (*Id.*) This letter does not reference Plaintiff's position description or his ability to possess a firearm, as requested in Port Director Chamberlain's 4/6/17 Letter. (*See id.*) (See also Hopkins Dep., pp. 51-53, PgID 1726-27 (Hopkins admitting that she did not represent in her correspondence to Defendant that she was aware of the functional tasks and requirements essential to the CBP officer position or provide an opinion about Plaintiff's ability to use a firearm).)

On April 14, 2017, Port Director Chamberlain informed Plaintiff that, in accordance with applicable policy, he was temporarily revoking Plaintiff's authority to carry a Government issued firearm due to concerns about the mental health symptoms Plaintiff was experiencing. (ECF No. 23-21, Ex. 21, Chamberlain 4/14/17 Letter, PgID 760.) The letter states that the decision would be revisited upon receipt

13

of additional medical information. (*Id.*) That revocation continued through the remainder of Plaintiff's employment as a CBPO. (See ECF No. 30-4, Ex. C, PgID 1479; ECF No. 30-5, Ex. D, PgID 1491; ECF No. 30-6, Ex. E, PgID 1495.)

Also on April 14, 2017, Dr. Hopkins wrote another letter, with a single sentence stating, "Nicholas Kabrovich is a patient at the clinic and he is able to return to work on 4/27/17 without restrictions." (ECF No. 23-22, Ex. 22, Hopkins 4/14/17 Letter, PgID 761.) As with her prior letter, this letter does not reference Plaintiff's position description or his ability to possess a firearm, as specifically requested in Chamberlain's 4/6/17 Letter. (*See id.*)[3]

On April 28, 2017, Plaintiff returned to work from medical leave and was assigned to light duty that he could perform without a firearm. (ECF No. 23-8, Ex. 7, MSPB Hearing Transcript 12/6/18 ("MSPB Tr. I"), at p. 327, PgID 697.) Plaintiff was directed to undergo a FFDE to determine, in light of his symptoms, his

---

[3] During the oral argument on Defendant's motion, counsel for Plaintiff repeatedly referred to a "detailed documented response" by Dr. Hopkins on April 27, 2017, explaining why Plaintiff should be returned to work without restrictions. However, there is no April 27, 2017 letter or report from Dr. Hopkins in the record. In Plaintiff's response brief, he only refers to the April 3 and April 12, 2017 letters from Dr. Hopkins, and her deposition testimony, in support of his assertion that "Dr. Hopkins said Kabrovich could return to work without restrictions on April 27, 2017." (Pl.'s Resp. at pp. 3-4, PgID 1793-94.) Dr. Hopkins stated in her deposition that she intended her April 12, 2017 letter discussed above to be her response to the Port Director's April 6, 2017 letter. (Ex. L, Hopkins Dep. at p. 26, PgID 1720.)

"continued capacity to perform the full range of duties of [his] position in a safe and effective manner." (ECF No. 23-23, Ex. 23, 4/28/18 FFDE Letter, PgID 762.) However, because of Plaintiff's pending worker's compensation claim, there was administrative confusion about the propriety of the FFDE, which would not be appropriate if it was related specifically to Plaintiff's pending worker's compensation claim. (ECF No. 23-24, Ex. 24, FFDE Email, PgID 765-67.) Defendant states that the FFDE was cancelled, erroneously, because it was not connected with Plaintiff's pending worker's compensation claim. (Ex. 7, MSPB Tr. I, pp. 178-79, PgID 548-49.)

The DOL, in assessing Plaintiff's worker's compensation claim, did not accept Dr. Hopkins' assessment of Plaintiff's condition, finding that she did not provide a "well rationalized opinion explaining how the diagnosed adjustment disorder with mixed anxiety and depression was caused [by] the actions and treatment" by Plaintiff's supervisor. (Ex. 16, DOL Letter, PgID 741.) The DOL thus referred Plaintiff for a psychiatric evaluation by Dr. Robert S. Burnstein, which was conducted on May 11, 2017. (*Id.*) Dr. Burnstein issued a report to the DOL, dated May 17, 2017, with regard to Plaintiff's worker's compensation claim, in which he opined that Plaintiff's mental health condition was related to harassment by his supervisor, that his condition had improved and he is now off his medication, and

that Dr. Burnstein saw no psychiatric difficulties with Plaintiff's employment. (ECF No. 23-31, Ex. 31, Burnstein Report, PgID 816-17.) However, in his assessment, Dr. Burnstein only reviewed Dr. Hopkins' records and talked with Plaintiff, but he did not conduct any diagnostic tests and he did not know the duties of Plaintiff's job as a CBPO, including whether he carried a firearm. (ECF No. 23-32, Ex. 32, Deposition of Robert S. Burnstein ("Burnstein Dep.") at pp. 20, 41-43, PgID 824, 830.) Further, Dr. Burnstein admitted that his examination of Plaintiff for purposes of his worker's compensation claim is not the same type of examination as a fitness for duty examination. (*Id.* at pp. 36-38, PgID 828-29.)

On June 21, 2017, the DOL accepted Plaintiff's worker's compensation claim, finding, based on Dr. Burnstein's report, that Plaintiff "suffers from Adjustment Reaction with Mixed Emotional Features, anxiety and depression as [a] result of his employment and [he] is entitled to compensation for lost wages for the intermittent periods he stopped working." (Ex. 16, DOL Letter, PgID 738, 741.) The DOL stated that "[t]he allegations of harassment and hostile work environment beginning in 2012 have been substantiated," in that Anaya "intimidated" Plaintiff and "made negative comments about [Plaintiff's] work performance and judgement [sic] in front of other Officers," and coworkers "acted in unprofessional behavior by making disparaging comments and spreading rumors about" Plaintiff. (*Id.* PgID 740.) The

16

DOL also "determined that [Plaintiff], as of the date of the Second Opinion evaluation [by Dr. Burnstein] is capable of performing his duties as a Customs and Border Patrol Agent." (*Id.* PgID 741.)

Plaintiff continued to work light duty positions for several months. According to documentation from Plaintiff's supervisors and coworkers, Plaintiff's job performance declined during this time period and he was noted to be inattentive, lethargic, staring off into space, and sleeping on the job on multiple occasions. (ECF No. 23-25, Ex. 25, FFDE Support Documentation, PgID 768-79 (collecting emails from April through September 2017).) Plaintiff was described as "easily agitated and aggressive or demeaning," and that he had an "unhealthy fixation with the return of his duty weapon." (*Id.*)

Plaintiff's rating supervisor, Nathanial Johnson, reached out to the Port Director on August 22, 2017, requesting that Plaintiff's fitness for duty be assessed based on reports from passengers and employees about Plaintiff's behavior, including sleeping on the job, slurred speech, and "threatening and disturbing" comments by Plaintiff. (ECF No. 23-26, Ex. 26, Johnson 8/22/17 Request, PgID 780-81.)

On August 28, 2017, Plaintiff was charged with Sleeping on Duty and notified of a proposal to suspend him from duty and pay for three days. (ECF No. 23-27, Ex.

17

27, 11/29/17 Suspension Notice, PgID 782.) On November 29, 2017, the charge was

sustained, but the suspension was mitigated to a two-day suspension from duty and

pay, to be effective January 23-25, 2018. (*Id.* PgID 782-83.)

On December 20, 2017, Dr. Hopkins provided a letter "To Whom It May

Concern," essentially repeating her statements in her April 12, 2017 letter discussed

above. (ECF No. 30-16, Ex. O, PgID 1759.) She then added:

> Based on the patient's history as well as information provided by his
> employer, all the patient's symptoms seem to have been related to
> conflict and harassment related to his work environment and it appears
> that if he were not subjected to harassment at work, he would not have
> experienced the above mentioned symptoms.

(*Id.*)

Plaintiff was rescheduled for a FFDE on December 27, 2017, because his

"behavior demonstrates that [he] ha[s] not been performing [his] duties to the

standard of a CBP Officer," which raised questions "regarding [his] continued

capacity to perform the full range of duties of [his] position in a safe and effective

manner." (ECF No. 23-28, Ex. 28, FFDE 12/27/17, PgID 785-86.)

Psychiatrist Dr. David Im examined Plaintiff on February 12, 2018, and issued

his report on March 1, 2018. (ECF No. 23-29, Ex. 29, Dr. Im FFDE Report, PgID

787-808.) Dr. Im reviewed numerous records, including Plaintiff's position

description, medical records, and letters and emails submitted by Plaintiff and by

18

Defendant, and he also interviewed Dr. Hopkins and Plaintiff's mother. (*Id.*) Dr. Im also examined Plaintiff and administered a psychological test that was then interpreted by a psychologist. (*Id.*) During his examination with Dr. Im, Plaintiff admitted that he stopped taking his medication in April 2017 and that he was not receiving mental health treatment. (*Id.*)

Dr. Im concluded, based on his examination of Plaintiff, his review of all the documents, and the interviews he conducted, that "Plaintiff is unable to safely, efficiently and reliably perform all of the duties of the [CBPO] position … without restriction," including "the ability to use proper judgment and make quick decisions in law enforcement situations to protect the lives of self, the public and other law enforcement personnel; carry a government-issued weapon; work extended hours, rotating shifts and unscheduled overtime; and drive a government vehicle." (*Id.* PgID 806.) Dr. Im further opined that, in the future, "[i]t is possible that with a combination of appropriate pharmacologic and/or non-pharmacologic (e.g., cognitive-behavioral or other psychotherapy) treatment for his anxiety and inattentive symptoms, he could more effectively manage the full duties of the CBPO position," and that the "psychiatric treatment should continue for at least one year, but likely will need to continue for longer than one year in order for him to have the best chance of achieving remission of symptoms." (*Id.* PgID 806-07.) Dr. Im

19

reported that Plaintiff's "prognosis is dependent on his full compliance with the psychiatric treatment outlined above," but noted that "this prognosis is somewhat guarded given his discontinuing his anti-anxiety medications in the past." (*Id.*)

Dr. Im's findings were subjected to peer review by another psychiatrist, Dr. John Zincone. (ECF No. 23-30, Ex. 30, Zincone Report, PgID 809-13.) Dr. Zincone reviewed the records and Dr. Im's Report, and agreed with Dr. Im's assessment and recommendations. (*Id.* PgID 812.) Dr. Zincone opined in a report dated March 13, 2018, that Plaintiff "is not fit to perform the essential work duties of the employee's position," and that his "impairments would cause difficulty … being able to safely use a firearm, make quick decisions in crisis situations, work rotating/extended shifts that could exacerbate such symptoms, and operate a government vehicle safely," and that he "would be considered unable to perform any task[s] that require critically consistent attention and concentration and alertness." (*Id.*)

### 3. Plaintiff's employment is terminated

On March 19, 2018, Port Director Chamberlain notified Plaintiff that he had been found unfit for duty as a CBPO, and thus that he no longer "meet[s] the conditions of employment as a [CPBO]." (ECF No. 23-33, Ex. 33, Chamberlain 3/19/18 Options Letter, PgID 839-40.) Chamberlain provided Plaintiff with three options to choose from: (1) apply for disability retirement or voluntary retirement if

20

qualified; (2) resign with an option to apply for disability retirement or voluntary retirement, if eligible, within one year; or (3) request a possible reassignment to another position within CBP. (*Id.*) The letter requested a response from Plaintiff within 15 calendar days of receipt of the letter. (*Id.*)

On April 10, 2018, Plaintiff notified Defendant by email that he rejected the three options presented in the March 19, 2018 Options Letter. (ECF No. 23-34, Ex. 34, Kabrovich 4/10/18 Email, PgID 841-42.) Plaintiff "further rejected the Port Director's authority and ability to remove [him] from [his] position within" CPB, and instead "elect[ed] to remain a [CPB Officer], and request[ed] that [he] be returned to full duty, with CPB returning to [him his] weapon and credentials[.]" (*Id.*)

On April 18, 2018, Plaintiff filed a second EEO Complaint, Case No. HS-CBP-00949-2018, this time alleging claims for disability discrimination and retaliation based on: (1) his two-day suspension for sleeping on duty; (2) his 2018 FFDE; (3) the 3/19/18 "Options" Letter from Chamberlain; and (4) his performance review being placed on hold. (ECF No. 25-2, Ex. 35, 2018 FAD, PgID 935-50.) The CRCL determined on February 26, 2019 (after Plaintiff's termination), based on a full review of the record, that Plaintiff failed to prove by a preponderance of the evidence that CPB discriminated against him under any claim. (*Id.*)

21

On April 19, 2018, Port Director Chamberlain proposed that Plaintiff be removed from his position based on the finding that he was medically unfit for duty. (ECF No. 23-35, Ex. 36, Chamberlain 4/19/18 Proposal Letter, PgID 843-45.)

Plaintiff, through counsel, responded on May 10, 2018, arguing that the Port Director should defer to the opinion of Plaintiff's treating physician over that of Dr. Im, and that Plaintiff should be returned to work without restriction. (ECF No. 23-36, Ex. 37, Kabrovich 5/10/18 Letter, PgID 846-47.) Plaintiff also provided Defendant with Dr. Burnstein's Report related to his worker's compensation claim. (*Id.*) This was the first time that report was supplied to Defendant (which only had the DOL Letter (Ex. 16) summarizing Dr. Burnstein's findings prior to this receiving this Report). (ECF No. 23-37, Ex. 38, Perry 6/8/18 Letter, PgID 848-51.)

On June 8, 2018, Director of Field Operations, Christopher Perry, approved the proposal to terminate Plaintiff's position. (Ex. 38, Perry 6/8/18 Termination Letter, PgID 848-51.) Director Perry stated he reviewed all of the medical documentation, including the opinions provided by Doctors Im, Zincone, Hopkins and Burnstein. (*Id.*) Director Perry explained that he afforded more weight to the opinion of Dr. Im over those of Dr. Hopkins and Dr. Burnstein because Dr. Im's evaluation was more thorough, detailed, and was corroborated by other evidence, and because Dr. Hopkins and Dr. Burnstein did not address Plaintiff's job

description or ability to carry a firearm specifically. (Ex. 2, MSPB Tr. II, at pp. 111-12, PgID 220-21.) Plaintiff's removal from federal service as a CBPO was effective on June 11, 2018, the date that he received the decision letter. (Ex. 38, Perry 6/8/18 Letter, PgID 851.)

### 4.    The Merit Systems Protection Board Review

On June 25, 2018, Plaintiff filed a claim with the MSPB challenging his termination and asserting the affirmative defenses of disability discrimination and retaliation for his EEO activity. The Administrative Judge ("AJ"), Erin Brandenburg, held a two-day hearing on December 6-7, 2018, and entered a comprehensive, 43-page Decision on April 23, 2019, upholding the termination. (ECF No. 23-38, Ex. 39, MSPB Decision, PgID 852-901.) The AJ stated that "once [Plaintiff] and his physician raised concerns about his ability to do his job, the agency had a duty to ensure that he could safely perform the duties of his position." (*Id.* PgID 881.) The AJ found that a preponderance of the evidence supports the agency's removal of Plaintiff from his position because of medical inability to perform his CBPO position. (*Id.* PgID 865-82.)

AJ Brandenburg further found, with regard to Plaintiff's disability discrimination and retaliation claims, that Plaintiff failed to establish that the Agency's stated reasons for its actions amounted to discrimination. (*Id.* PgID 891-

92.) The AJ gave more weight to Dr. Im's conclusions because he did not rely solely on Plaintiff's account, but also spoke with Dr. Hopkins, Plaintiff's mother, and sought input from Defendant. (*Id.* PgID 871.) The AJ noted that neither Dr. Hopkins nor Dr. Burnstein had an understanding of Plaintiff's job duties, and that Dr. Burnstein testified that he was not even aware that Plaintiff carried a firearm. (*Id.* PgID 872.) The AJ further found that while it is undisputed that Plaintiff engaged in protected activities, Plaintiff has not established by a preponderance of the evidence that his protected EEO activity was a motivating factor in the agency's removal action. (*Id.* PgID 893-94.)

### B.    Procedural History

On July 6, 2020, Defendant filed this Motion for Summary Judgment, asserting that Plaintiff's claims should be dismissed. (ECF No. 23, Def.'s Mot. S.J.) Defendant argues that Plaintiff's disability discrimination claim fails because he cannot establish that any action was taken because he has a disability, and that Defendant reasonably relied on a comprehensive and objectively reasonable medical opinion in finding him unfit for duty. Defendant contends it is entitled to summary judgment on Plaintiff's hostile environment claim because none of the alleged harassment was based on his disability, it was not severe and pervasive, and that, when apprised of Plaintiff's allegations, Defendant took appropriate corrective

24

action. Defendant argues that Plaintiff's retaliation claim fails because the alleged harassment began before he engaged in protected activity, and the actions leading to his termination are unrelated to his protected activity. Finally, Defendant contends that the Court should affirm the MSPB's ruling that Plaintiff was unable to perform the essential functions of his position as a CPBO because the ruling was supported by substantial evidence and was not an abuse of discretion.

Plaintiff's Response contends that he has established a prima facie case of disability discrimination, and that he has rebutted the Defendant's proffered non-discriminatory reason for his termination. He contends that genuine issues of fact exist as to whether Defendant retaliated against him by removing him from his position as a CBPO, by disciplining him, by forcing him to perform unreasonable and excessive duties, and by terminating his employment contrary to the advice of his doctors. Finally, Plaintiff asserts that he is entitled to a trial on the facts in a "mixed case" wherein he seeks the Court's review of a MSPB decision in a disability discrimination claim.

Defendant's reply brief asserts that Plaintiff has failed to establish a claim for disability discrimination or retaliation because he fails to establish a prima facie case of pretext. (ECF No. 34, Def.'s Reply). Defendant further argues that Plaintiff fails to establish a hostile environment claim because any alleged harassment was not

based on Plaintiff's disabilities. Finally, Defendant contends that Plaintiff failed to establish that the AJ abused her discretion when she upheld Plaintiff's termination.

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Express Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere

possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

### III.  ANALYSIS

#### A.      Plaintiff's Disability Discrimination Claim

Plaintiff claims that he was discriminated against in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (FAC, Count I ¶¶ 95-104, PgID 69-71.) Defendant argues that summary judgment is appropriate on this claim because Plaintiff cannot come forward with direct evidence of discrimination or circumstantial evidence to survive the *McDonnell Douglas* analysis. In response, Plaintiff argues both that he presents direct evidence of discrimination, and that he has presented sufficient circumstantial evidence of discrimination to survive summary judgment.

#### 1.      Rehabilitation Act claim overview

The Rehabilitation Act prohibits federal agencies and other programs receiving federal funding from discriminating against any qualified individual with a disability, providing that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity … conducted by any Executive agency…." 29 U.S.C. § 794(a).

"By statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination." *Burns v. City of*

*Columbus*, 91 F.3d 836, 842 (citing 29 U.S.C. § 794(d)). Because the two Acts are generally similar in scope and purpose, decisions analyzing either statute are applicable to both. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). However, "[w]hile the ADA and the Rehabilitation Act are analytically similar and contain the same protections against disability discrimination, they are not identical." *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314-17 (6th Cir. 2012) (en banc)). "The ADA and the Rehabilitation Act both prohibit discrimination against the disabled—but the Rehabilitation Act, unlike the ADA, expressly prohibits discrimination *solely* on the basis of disability." *Lee v. City of Columbus, Oh.*, 636 F.3d 245, 250 (6th Cir. 2011) (emphasis added); *see Bent-Crumbley*, 799 F. App'x at 345 (noting that "but for" causation is required under the ADA).

To state a claim for relief for disability discrimination under the Rehabilitation Act, the plaintiff must show "(1) that he is disabled; (2) that he was otherwise qualified for the position; (3) that he was excluded solely by reason of his disability; (4) and that the relevant program is receiving federal financial assistance." *Doe v. Salvation Army in the U.S.*, 685 F.3d 564, 567 (6th Cir. 2012) (citation omitted); *Lee*, 636 F.3d at 250.

In proving a violation of this statute, a plaintiff may utilize direct or circumstantial evidence. *Bent-Crumbley*, 799 F. App'x at 345; *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). In the context of the Rehabilitation Act, the Sixth Circuit has characterized direct evidence as follows:

> "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (internal quotation marks and citation omitted). "The direct evidence standard essentially requires an admission in some form by the employer that it relied on the disability in making an employment decision." *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002) (citation omitted).

*Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 844 (6th Cir. 2018). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate ... satisfy this criteria." *Sharp v. Aker Plant Servs. Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013). "[I]f the evidence requires the jury to infer some further fact, it is not direct evidence." *Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 654 F. App'x 675, 682 (6th Cir. 2016) (quoting *Chandler v. Specialty Tires of Am. (Tenn.), Inc.,* 134 F. App'x 921, 927 (6th Cir. 2005)).

"A plaintiff showing a disability and direct evidence of discrimination based on that disability must also show that []he is otherwise qualified to do the job with or without accommodation and that 'the adverse employment decision was based *solely* on [his] disability." *Bent-Crumbley*, 799 F. App'x at 345-46 (quoting *Monette*

30

*v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1180-81 (6th Cir. 1996), *abrogated in part by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).) "Once the plaintiff has established these elements, the employer 'bear[s] the burden of proving that a challenged job criterion is essential ... or that a proposed accommodation will impose an undue hardship upon the employer.'" *Mitchell*, 738 F. App'x at 844 (quoting *Monette*, 90 F.3d at 1186).

If the plaintiff relies on indirect, circumstantial evidence, however, the court is to analyze the claim based on the familiar burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

To establish a prima facie case for disability discrimination under the Rehabilitation Act, a plaintiff must show: (1) he is an individual with a disability; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action solely by reason of his disability; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Spence v. Donahoe*, 515 F. App'x 561, 567-58 (6th Cir. 2013) (citing *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S.

167 (2009)). "The final element may also be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'" *Id.* (quoting *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007)); *Dunning v. War Mem'l Hosp.*, 534 F. App'x 326, 334 (6th Cir. 2013) ("the prima facie case under the Act mirrors that of the ADA, with only one relevant exception: Under the Rehabilitation Act, Plaintiff must show that he was excluded *solely* by reason of his disability.") (emphasis in original, citations omitted).

If the plaintiff establishes a prima facie case, "the defendant has a burden of production to articulate a nondiscriminatory reason for its action." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (internal emphasis omitted). Meeting the burden of stating a legitimate nondiscriminatory basis for the action is "merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 600 (6th Cir. 2014) (citation omitted).

"If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Gribcheck*, 245 F.3d at 550. "A plaintiff may show pretext by demonstrating '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or

(3) that they were insufficient to motivate the adverse employment action.'" *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 3013) (alternations in original, citation omitted). "In examining pretext under the Rehabilitation Act, unlike in other employment-discrimination contexts, the plaintiff must show that discrimination was the sole cause of the action, not just one of the causes." *Mitchell v. United States Postal Serv.*, No. 14-13916, 2017 WL 4405013, at *6 (E.D. Mich. Oct. 4, 2017) (citing *Jones*, 488 F.3d at 409-10), *aff'd*, 738 F. App'x 838 (6th Cir. 2018).

## 2. Direct evidence of discrimination

Plaintiff contends that he has the "'smoking gun' evidence necessary to get his case to trial." (Pl.'s Resp. at p. 13, PgID 1803.) Specifically, he claims that "[t]he report of Chief Adam Streetman, coupled with the Department of Labor's findings, and statements by his co-workers all provide that direct evidence of discrimination." (*Id.*) The Court finds that Plaintiff has failed to provide any "direct evidence" of discrimination.

First, the Streetman Report did not find that Plaintiff was subjected to a hostile work environment because of a disability. (See Ex. 9, Streetman Report, PgID 713-15.) Plaintiff's email to Watch Commander Witt, which prompted the investigation, does not complain that any of the alleged harassing conduct was related to an alleged disability. (Ex. 8, 2/24/16 Email, PgID 712.) The Streetman Report does not mention

33

ADHD, a learning disability, medical conditions, or any disability-related comments, and does not find that Plaintiff was subjected to a hostile work environment because of a disability. (See Ex. 9, Streetman Report, PgID 713-15.) Although Streetman reported that Plaintiff's co-workers stated that Plaintiff is "different" and "atypical," there is no indication that anyone intended these comments to refer to Plaintiff's disabilities rather than his atypical social behavior. Streetman confirmed in a subsequent declaration in 2020 that Plaintiff "never stated to [Streetman] that he has a learning disability or [ADHD]," and "never indicated to [Streetman] that he felt harassed because he has a disability." (Ex. 13, Streetman Decl. ¶¶ 5-6, PgID 734.)

Plaintiff contends that a "fair reading" of the Streetman Report constitutes direct evidence of disability discrimination. (Pl.'s Resp. at p. 13, PgID 1803.) However, as stated above, "[d]irect evidence is evidence that proves the existence of a fact without requiring any inferences." *Grizzell*, 461 F.3d at 719 (internal quotation marks and citation omitted). The Streetman Report does not provide such evidence.

Plaintiff next argues that emails supplied by two of his coworkers, Dimitri Qafko and Michael Berney, in September 2016, relating to the time periods of Anaya's supervision, constitute direct evidence of disability discrimination. (Pl.'s

34

Resp. at p. 15, PgID 1805, citing Exs. P & Q.) However, the Court finds that an examination of the content of those two emails does not establish direct evidence of disability discrimination. Berney states only:

> I have personally witnessed Mr. Kabrovich being subject to treatment which SCBPO Streetman characterized as "Classic Hostile Environment" in nature during his interview with me. This included remarks made to Mr. Kabrovich directly and made to others about Mr. Kabrovich, as well as radio traffic to and about Mr. Kabrovich. I am unwilling to share specifics about this while an inquiry is being conducted.

(ECF No. 30-17, Ex. P, Berney Email, PgID 1760.) This cursory email, which wholly fails to mention any "disability," fails to constitute direct evidence of disability discrimination.

Similarly, Qafko claims in his email to "have witnessed all types of harassment, discriminatory treatment and retaliation against [Plaintiff] for absolutely no valid and apparent reason." (ECF No. 30-18, Ex. Q, Qafko Email, PgID 1761.) However, nowhere in his email does Qafko claim that Plaintiff was treated differently because of a disability. Rather, he claims there was "no reason" for certain employment actions, or that actions were taken because Plaintiff "takes too long with his inspections." (*Id.*) He also broadly asserts that there are other officers who "have made many more mistakes and have less work ethic than [Plaintiff], but yet they are left alone." (*Id.*) This conclusory email does not provide the names of

any such "other officers" and fails to supply direct evidence of disability discrimination against Plaintiff.

Finally, Plaintiff asserts that the "Department of Labor's findings" in the worker's compensation matter constitute direct evidence of disability discrimination, but he fails to explain how. (See Pl.'s Resp. at p. 13, PgID 1803.) While the DOL Report noted in its "Accepted Events that are Factors of Employment" that "[t]he allegations of harassment and hostile work environment beginning in 2012 have been substantiated," apparently relying on the Streetman Report, there is nothing in the DOL Report that the alleged harassment and hostile work environment was because of a disability. (See Ex. 16, DOL Report, PgID 740.) Rather, as with the Streetman Report, the DOL Report noted that Anaya "intimidated" Plaintiff and made negative comments about his "work performance and judgement [sic] in front of others," and that fellow employees made disparaging comments and spread rumors about Plaintiff. (*Id.*) Similarly, Dr. Burnstein, on whose opinion the DOL relies, testified that he simply accepted the statement regarding Plaintiff's alleged workplace harassment as true, as an "accepted fact," but that he did not independently verify whether Plaintiff suffered any workplace harassment. (Ex. 32, Burnstein Dep. at pp. 42-43, PgID 830.) Accordingly, this DOL Report fails to constitute direct evidence of discrimination.

36

As the evidence Plaintiff relies on would require the finder of fact to draw inferences in order to possibly reach any conclusion that unlawful disability discrimination was the sole reason for Plaintiff's termination, it does not constitute direct evidence of discrimination.

### 3.    Circumstantial evidence of discrimination

### a.  Prima facie case

As explained above, to establish a prima facie case of disability discrimination, Plaintiff must show that: (1) he is an individual with a disability; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action solely by reason of his disability; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Spence*, 515 F. App'x at 567-58. "The final element may also be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'" *Id.*

### i.  Adverse employment actions

Defendant argues that Plaintiff cannot establish the third prong of the prima facie analysis based on his receipt of a written reprimand or Defendant's requests for a FFDE. (Def.'s Mot. at pp. 14-16, PgID 146-48.) Specifically, Defendant

maintains that Plaintiff's receipt of a written reprimand in May 2017 for failing to follow procedure does not constitute an adverse action because it was not accompanied by any adverse consequence. (*Id.*, citing *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) ("A written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action.").) Defendant also argues that being required to undergo an FFDE is not an adverse action. (*Id.* at pp. 14-15, PgID 146-47, citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999) (holding a fitness examination "ordered for valid reasons can neither count as an adverse job action nor prove discrimination"); and *Stone v. Bd. of Dirs. of Tennessee Valley Auth.*, 35 F. App'x 193, 200 (6th Cir. 2002) ("There was no evidence that the fitness examination affected the terms and conditions of plaintiff's employment … [n]ot everything that makes an employee unhappy is an adverse employment action.").)

Plaintiff does not directly address this argument in his Response, other than to contend that his termination, and the "conduct leading up to termination was disability-related adverse action" and that he "was disciplined." (Pl.'s Resp. at p. 16, PgID 1806.) The Court finds that the May 2017 written reprimand, standing alone, does not constitute an adverse employment action, as it did not result in a materially

adverse consequence such as lowered pay, demotion, suspension, etc. *See Taylor*, 703 F.3d at 338; *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) (plaintiff failed to show that written reprimand constituted an adverse employment action "without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like").

With regard to the FFDEs, the Sixth Circuit has held that "an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Sullivan*, 197 F.3d at 813; *accord James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 250 (6th Cir. 2009) ("[B]ecause Goodyear had a valid reason to demand the [functional capacity evaluation], it did not perpetrate an adverse employment action under the ADA as a matter of law."). The Sixth Circuit has stated that an "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Pena v. City of Flushing*, 651 F. App'x 415, 420 (6th Cir. 2016) (quoting *Sullivan*, 197 F.3d at 810). "Employers are permitted to 'conduct voluntary medical examinations' and 'make inquiries into the ability of an employees to perform job-related functions.'" *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 n.7 (6th Cir. 2012) (citation omitted).

Plaintiff here contests Defendant's reasons for ordering the FFDEs, and contends that the second FFDE lead to his termination, and that his termination is an adverse employment action. (Pl.'s Resp. at p. 16, PgID 1806.) Defendant does not argue that Plaintiff's termination is not an adverse employment action, but just that the two FFDE requests, standing alone, do not constitute materially adverse employment actions. (See Def.'s Mot.)

It is the employer's burden to show that the exam was job-related and consistent with business necessity. *Gipson v. Tawas Police Auth.*, 794 F. App'x 503, 505-06 (6th Cir. 2019) (citing *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (2014)). An employer can meet its burden by showing that "there [was] significant evidence that could cause a reasonable person to inquire as to whether [the] employee [was] still capable of performing his job." *Id.* (alternations in original) (quoting *Sullivan*, 197 F.3d at 811). In addition, the Sixth Circuit has recognized that "'special circumstances' may exist in workplaces where employees respond to stressful situations and shoulder responsibility for public safety." *Kroll*, 763 F.3d at 626. "In these 'public safety' workplaces, an employer may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces because employees are 'in positions where they can do tremendous harm

if they act irrationally,' and thus they pose a greater threat to themselves and others."
*Id* (quoting *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999)).

Here, the Court finds there was sufficient evidence that Defendant was justified in requesting that Plaintiff undergo both FFDEs. The records received from Plaintiff's doctor that he needed time off work because of a "flare up of his symptoms" and that his condition would cause episodic flare ups requiring Plaintiff to miss one to two days of work every month because of his anxiety, poor concentration, trouble focusing, agitation, nervousness, and depression, raised legitimate concerns about Plaintiff's ability to perform all of the duties of his CPBO position. Defendant also noted noticeable changes in Plaintiff's behavior once he returned to work from medical leave, supported by emails and reports from Plaintiff's supervisor and coworkers. Defendant has demonstrated that it had a reasonable belief based on objective evidence that each FFDE was required, given Plaintiff's position and requirement that he carry a government-issued firearm. *See Sullivan*, 197 F.3d at 810 (upholding an exam request, noting "an employer needs to be able to determine the cause of an employee's aberrant behavior"); *see also Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311-12 (11th Cir. 2013) (concluding that an examination was "job related" because it assessed "an employee's ability to handle reasonably necessary stress … [which is an] essential

function[] of any position") (internal quotation marks omitted); *Watson*, 177 F.3d at 935 ("In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity.").

That Plaintiff's physician, Dr. Hopkins, opined that Plaintiff could return to work with no restrictions fails to render the FFDE requests invalid or illegitimate. Plaintiff "may not dictate the terms of his medical examination." *Pena*, 651 F. App'x at 422 (quoting *Sullivan*, 197 F.3d at 809 n.2). Thus, "[i]f an employer is justified in requiring a medical exam, then the employer gets to decide who performs the medical exam." *Gipson*, 794 F. App'x at 506 n.3.; *accord Pena*, 651 F. App'x at 422 (observing that "an employee 'may not dictate the terms of his medical examination.' In other words, that Pena's doctors cleared him for duty does not excuse him for failing to see Dr. Forsberg.") (quoting *Sullivan*, 197 F.3d at 809 n.2)); *Mitchell*, 738 F. App'x at 846 ("It was therefore not discriminatory for USPS to reject the [treating doctor's] notes [stating that the plaintiff suffered from depression, did not pose a danger to himself or others, and could return to work without restrictions]… because the notes did not provide the information that USPS requested.").

42

Because the Court finds that each FFDE was legitimate, those examinations "can neither count as an adverse job action nor prove discrimination." *Sullivan*, 197 F.3d at 813; *see also Pena*, 651 F. App'x at 421 (holding that "the City's request for [plaintiff] to attend a fitness for duty examination is not an adverse action sufficient to satisfy the prima facie case of disability discrimination") (quoting *Sullivan*, 197 F.3d at 811).[4]

### ii.  Similarly-situated employees treated differently

Defendant also argues that Plaintiff cannot establish the fifth prong of his prima facie case "based on the written reprimand, removal of his weapon, the two-day suspension for sleeping on duty, the FFDE requests, or his termination" because "he has no evidence he was treated differently than anyone else under the same circumstances." (Def.'s Mot. at pp. 15-16, PgID 147-48.) Plaintiff summarily asserts in his response that "[t]here is evidence other CBPO's who were disabled, but they got to keep their jobs." (Pl.'s Resp. at p. 20, PgID 1810.) In support, Plaintiff cites

---

[4] The Sixth Circuit in *Gipson* recognized that the definition of an "adverse employment action" for retaliation claims is broader than for discrimination claims*, see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-67 (2006), but concluded that "even in a retaliation claim" an "adverse employment action" is not "broad enough to include a valid medical exam requested for legitimate business reasons" because "[o]therwise, every employee who is required to take a medical exam when he requests accommodations could make out a prima facie case of retaliation." *Gipson*, 794 F. App'x at 508 n.6.

only to Ex. Q, the September 2016 Qafko email. (*See id.*, citing Ex. Q.) However, that email fails to identify any "similarly situated non-protected employees [who] were treated more favorably" than Plaintiff. *See Jones*, 488 F.3d at 404. Rather, that email states only that Qafko "can name several officers here at DMA that have made many more mistakes and have less work ethic than [Plaintiff], but yet they are left alone," and that he "can name multiple other officers that take much longer with their inspections than [Plaintiff], and they are not being relocated to a less desirable position because of their speed of conducting inspections." (Ex. Q, Qafko Email, PgID 1366.) However, these purported "other officers" are never identified, and more importantly, there is no evidence that any individuals were similarly situated to Plaintiff. These unsupported assertions, referring to unnamed individuals, fail to meet Plaintiff's burden to show "that similarly situated non-protected employees were treated more favorably" than Plaintiff.

Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of disability discrimination. However, even if Plaintiff could establish a prima facie case, his disability discrimination would nevertheless fail for the following reasons.

### b. Pretext

If Plaintiff establishes a prima facie case of disability discrimination, the Court proceeds with the next stages of the *McDonnell Douglas* analysis. Defendant must state a legitimate, nondiscriminatory basis for its actions. *Jones*, 488 F.3d at 404. Defendant asserts that once Dr. Hopkins and Plaintiff raised concerns about Plaintiff's ability to do his job due to the severity of psychiatric symptoms he was experiencing in March and April 2017, Defendant sought further information about Plaintiff's condition, including his ability to carry a firearm in the course of his duties as a CBPO, temporarily removed Plaintiff's firearm pending further medical documentation, and properly requested a FFDE. (Def.'s Mot. at p. 17, PgID 149.) When Plaintiff's erratic behavior was reported in Dr. Im's comprehensive FFDE report, Plaintiff was found unfit for duty and terminated as a CBPO. (*Id.*) The Court finds that Defendant has carried its burden of articulating a legitimate, nondiscriminatory basis for its actions.

The burden then shifts back to Plaintiff to show that Defendant's reasons were just a pretext for discrimination. "A plaintiff may show pretext by demonstrating: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or (3) that they were insufficient to motivate the adverse employment action.'" *Davis*, 717 F.3d at 491

(alterations in original) (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). "In examining pretext under the Rehabilitation Act, unlike in other employment-discrimination contexts, the plaintiff must show that discrimination was the sole cause of the action, not just one of the causes." *Mitchell*, 2017 WL 4405013, at *6 (citing *Rumburg v. Sec'y of the Army*, No. 10-11670, 2011 WL 1595067, at *6 (E.D. Mich. Apr. 11, 2011) (citing *Jones*, 488 F.3d at 409-10)).

Plaintiff argues that Defendant's stated reason for his termination – that he was unfit for duty as a CBPO – is pretextual. (Pl.'s Resp. at p. 22, PgID 1812.) Plaintiff does not specify which theory of pretext he is pursuing. But "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). In other words, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.* In the summary judgment context, this requires Plaintiff to "produce[ ] evidence from which a jury could reasonably doubt the employer's explanation." *Id.* The evidence of discrimination that Plaintiff relies on does not satisfy this burden.

Defendant contends that because Plaintiff held a weapons-bearing position, it had an obligation to ensure that Plaintiff was up to the task, and that "[e]very action that [it] took was to confirm that Plaintiff could handle the duties of his position,

with an emphasis on his ability to make appropriate decisions with a firearm." (Def.'s Mot. at p. 17, PgID 149.) Plaintiff claims that Defendant's concern over Plaintiff's fitness for his CBPO position was not the true motivation for its actions because Plaintiff provided Defendant with several letters from his doctor, the last of which stated he could return to work with no restrictions. (Pl.'s Resp. at p. 23, PgID 1813.) However, that Defendant did not accept Dr. Hopkins' latest opinion, that Plaintiff could return to work "without restrictions," does not establish pretext.

First, as Defendant points out, Plaintiff was returned to work, on light duty, he was just not permitted to carry a firearm. (Def.'s Resp. at p. 17, PgID 149.) Second, in response to Dr. Hopkins' letter that Plaintiff should stay off work for three weeks "because of the ongoing severity of his symptoms" (Ex 17, Hopkins 4/3/17 Letter, PgID 742), on April 6, 2017, Defendant sought further information about Plaintiff's condition, specifically including "[w]ritten confirmation from [Plaintiff's] physician, that they have reviewed the provided position description and the functional tasks and requirements essential to the position," and "specifically addressing [Plaintiff's] ability to possess/utilize a firearm[.]" (Ex. 18, Chamberlain 4/6/17 Letter, PgID 744 (emphasis in original).) Dr. Hopkins thereafter stated in Plaintiff's April 10, 2017 FMLA Request that Plaintiff is unable to perform "any and all job functions," and that his condition will cause episodic flare-ups, causing

47

Plaintiff to be absent from work, one to two days each month. (Ex. 19, FMLA Request, PgID 756-67.) But then just two days later, on April 12, 2017, and again on April 14, 2017, Dr. Hopkins claimed Plaintiff could return to work without restrictions. (Ex 20, Hopkins 4/12/17 Letter, PgID 759; Ex. 22, Hopkins 4/14/17 Letter, PgID 761.) These statements by Dr. Hopkins regarding Plaintiff's ability to work, only days apart, are contradictory. Further, it is undisputed that the cursory documentation provided by Dr. Hopkins in response to Port Director Chamberlain's April 6, 2017 letter failed to state that she reviewed Plaintiff's CBPO position description or address Plaintiff's ability to use a firearm. (Ex. L, Hopkins Dep. pp. 51-53, PgID 1726-27.) In light of this incomplete and contradictory information from Dr. Hopkins, Defendant justifiably requested an FFDE on April 28, 2017. (Ex. 23, 4/28/17 FFDE Letter, PgID 762.)

Further, the May 2017 report by Dr. Burnstein, rendered in the worker's compensation context, did not address Plaintiff's job description or ability to carry a firearm. (Ex. 31, Burnstein Report, PgID 814-18.) Dr. Burnstein admitted that he did not know Plaintiff's proper position ("just … that he was working for Homeland Security at the airport") or that he was required to carry a firearm, and he acknowledged that his evaluation of Plaintiff for worker's compensation benefits is

different than a forensic evaluation to determine if an employee is fit for duty. (Ex.

32, Burnstein Dep. at pp. 36-38, 41-43, PgID 828-30.)

Plaintiff complains of Defendant's decision to rely on the opinions of Dr. Im

and Dr. Zincone in finding that Plaintiff was not fit for duty. However, the evidence

clearly establishes that Dr. Im did a thorough determination of Plaintiff's condition,

including examining Plaintiff for over three hours, administering a diagnostic test,

gathering documentation from Dr. Hopkins, the DOL and Defendant, and he spoke

with Plaintiff's mother and Dr. Hopkins. (Ex. 29, Dr. Im Report, PgID 788-789.) Dr.

Im related his findings specifically to Plaintiff's ability to fulfill his duties as a CBPO

and his ability to carry a firearm. (*Id.*) Dr. Im's findings were then subjected to peer

review by Dr. Zincone, who affirmed Dr. Im's findings. (Ex. 30, PgID 809-13.) For

all of these reasons it was reasonable for Defendant to rely on Dr. Im's and Dr.

Zincone's opinions over those of Dr. Hopkins and Dr. Burnstein. The Court notes

that Dr. Hopkins did not physically examine Plaintiff and that her treatment of him

in February, March and April of 2017 – when she was recommending first that he

be given time off work, and then that he be returned to work with no restrictions –

was only virtual, over the "patient portal" or by phone calls, and not in person.

(Hopkins Dep. at pp. 11, 19, 21-22, 57, PgID 1716, 1718-19, 1728.)

While Plaintiff may question Defendant's decision to elevate Dr. Im's Report above Dr. Hopkins' notes and Dr. Burnstein's report in determining whether Plaintiff was fit for duty, the Court's analysis is not whether Defendant's decision was wise or correct, but rather whether it was discriminatory. *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015) ("[T]he law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct."); *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'") (quoting *Chen*, 580 F.3d at 400 (6th Cir. 2009)). Dr. Im and Dr. Zincone provided the only medical opinions addressing Plaintiff's job description and his ability to carry a firearm. Dr. Hopkins' and Dr. Burnstein's opinions did not address either Plaintiff's position or his ability to carry a firearm. *See Michael*, 808 F.3d at 307-09 (stating that defendant reasonably relied on objective medical opinions, even though they differed from medical opinions proffered by the plaintiff which did not even address the plaintiff's specific job functions or his ability to safely perform the duties of his job).

50

Plaintiff further argues pretext based on his claim that the reason for the two FFDEs was different. However, that the reason for the second FFDE is different than the reason for the first FFDE fails to establish pretext. This is not a case where the defendant repeatedly changed the reasons for termination. Rather, here there are two separate FFDEs, ordered at two different times, eight months apart, and the explanations of why each was required are different, although both are related to Plaintiff's mental health and continued capacity to perform the duties of his position. (*Compare* Ex. 23, 4/28/17 FFDE Letter (directing a FFDE because "your diagnosed condition [by Dr. Hopkins] and the medication you have been prescribed raises questions ... regarding your continued capacity to perform the full range of duties of your position in a safe and effective manner"), *with* Ex. 28, 12/27/17 FFDE Letter (directing a FFDE because "[y]our behavior demonstrates that you have not been performing your duties to the standard of a CBP Officer" and "raises questions ... regarding your continued capacity to perform the full range of duties of your position in a safe and effective manner").)[5]

---

[5] Plaintiff's reliance on case law stating that "an employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining the employee," (Pl.'s Resp. at pp. 10, 24, PgID 1800, 1814), is misplaced. Those cases involve employees who were disciplined for their insubordination in direct response to the defendant's unlawful treatment. (*See id.*, citing, e.g., *NLRB v. Southwestern Bell Tel. Co.*, 694 F.2d 974, 978 (5th Cir. 1982); *Hertz v. Luzenac America*, 370 F.3d 1014, 1021-22 (10th Cir. 2004); *Excel Corp. v. Bosley*, 165 F.3d 635, 637 (8th Cir. 1999);

Plaintiff also contends in his Response brief that the option for reassignment presented to Plaintiff in the March 2018 Options Letter was "a red herring" because Defendant did not identify in the letter a specific available position, and thus resignation or disability retirement were Plaintiff's only options. (Pl.'s Resp. at p. 23, PgID 1813.) That Options Letter gave Plaintiff the option to "[r]equest assistance in a possible reassignment to another position within [CBP]." (Ex. 33, PgID 840.) Plaintiff did not present any evidence that he ever requested such assistance, or even ever inquired about any available positions. Rather, he expressly rejected all of the options presented. (Ex. 34, Plaintiff 4/10/18 Response, PgID 841-42.)

Plaintiff has failed to present any evidence that the reasons for any of the actions he challenges were a pretext for disability discrimination, and that any actions were taken solely because of a disability, and Defendant therefore is entitled to summary judgment on Plaintiff's claim of disability discrimination.

---

*Yazdian v. ConMed Endoscopic Technologies*, 793 F.3d 634, 651 (6th Cir. 2015).) Plaintiff seeks to invoke that doctrine of "provoked insubordination" to excuse the "purported changes in [his] performance [upon his return from medical leave] (lethargy, sleepiness, slurring speech, inattentiveness) between April and August 2017[.]" (Pl.'s Resp. at p. 24, PgID 1814.) Those performance issues in mid-2017 and 2018 (which Plaintiff now appears to concede occurred) are simply not similar to the type of "provoked insubordination" in the cases upon which Plaintiff relies (e.g., making "objectively rude, disrespectful and insubordinate comments," yelling loudly at the supervisor, intemperate reactions, etc.).

### B.    Hostile Environment Claim

Defendant also contends that Plaintiff's complaints regarding Anaya's and others' criticisms about his work performance cannot be used to establish a hostile work environment, citing cases finding that work performance comments and criticisms do not constitute harassment. (Def.'s Mot. at pp. 20-21, PgID 152-53.) Defendant argues that the alleged harassment was not based on Plaintiff's disability, and that Plaintiff has failed to present evidence of disability-based animus, because he admitted that back in 2016 Anaya never referred to his conditions and did not disparage people with disabilities in general. (Def.'s Mot. at p. 22, citing Ex. 1, Kabrovich Dep. at pp. 62, 78, PgID 182, 186.) The Court agrees.

As discussed above, Streetman found evidence of teasing and spreading rumors, but did not find evidence that the treatment was based on a disability. (Ex. 9, Streetman Report, PgID 713-15; Ex. 13, Streetman Decl. ¶¶ 6-7, PgID 713-15.) The alleged harassment of Plaintiff about his work performance by Anaya and his coworkers is not commendable, but cannot be used to establish an actionable hostile environment claim under the Rehabilitation Act. *See Wasek v. Arrow Energy Serv., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) (stating that the "conduct of jerks, bullies, and persecutors is simply not actionable … unless they are acting because of the victim's [protected characteristic]"); *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x

53

323, 338 (6th Cir. 2012) (a "barrage of criticism" did not create a hostile environment because while "such criticisms certainly may have been frustrating and discouraging, they were part of 'the ordinary tribulations of the workplace'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted)). Federal employment discrimination laws do not "set forth 'a general civility code for the American workplace,'" and they do not insulate employees from "personality conflicts at work that generate antipathy" or "snubbing by supervisors and coworkers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted).

Further, as discussed above, Plaintiff has not shown that he was treated poorly *because of* his disability. Plaintiff's subjective opinion that he was subjected to hostility because he has a disability is not sufficient to create a genuine issue of fact. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.").

Defendant further contends that the alleged conduct was not severe and pervasive, and that Defendant took appropriate corrective action with respect to Plaintiff's complaints. (Def.'s Mot. at pp. 23-25, PgID 155-57.) Plaintiff complains primarily of criticism about his work performance, being yelled at by his supervisor,

Anaya, in 2016, his co-workers spreading rumors about him, and instances of others calling him "T-Rex" and "Special K." However, this behavior appears to be insufficient to create an actionable hostile work environment under the Rehabilitation Act. *See, e.g., Batuyong v. Gates*, 337 F. App'x 451, 457 (6th Cir. 2009) (holding that a supervisor who "raised his voice, inappropriately, became verbally abusive, and chastised [plaintiff] in front of others" did not create a hostile work environment); *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 128 (6th Cir. 2007) (no hostile environment based on disability where employees threw plaintiff's coat on the floor daily, regularly laughed at and teased him, and had a nickname for him); *Coulson*, 31 F. App'x at 858 (holding that calling plaintiff who suffered from major depression and other mental problems nicknames, such as "looney toon," "wacko," "crazy," and "Rambo," was insufficient to create a hostile work environment); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (concluding that supervisor's "contentious oral confrontation" with yelling, "stern words about [plaintiff's] ability to walk," and "words express[ing] skepticism regarding [plaintiff's] condition" did not create a hostile work environment).

Further, Defendant took prompt remedial action when Plaintiff complained. Anaya was removed as Plaintiff's ratings supervisor, Defendant conducted a prompt investigation, issued a cease and desist letter to Anaya, and then a letter of reprimand.

In addition, Plaintiff reported that his issues with Anaya improved and that he no longer had any substantive interactions with him. (Ex. 2, MSPB Tr. II at pp. 239-40, PgID 348-49.)

Thus, the Court finds that Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

### C. Retaliation

Plaintiff alleges that Defendant retaliated against him because of the finding in the Streetman Report that a hostile work environment existed and based on his EEO complaints. (FAC ¶¶ 105-09, PgID 71.) Plaintiff does not argue that he relies on direct evidence of retaliation, but instead cites to the circumstantial framework for establishing a prima facie case for retaliation. (Pl.'s Resp. at pp. 26-28, PgID 1816-18.)

The Court applies the same *McDonnell Douglas* burden-shifting framework discussed above to retaliation claims under the Rehabilitation Act. *Gribcheck*, 245 F.3d at 550 (citing *McDonnell Douglas*, 411 U.S. at 802). First, a plaintiff must set forth a prima facie case of discrimination. *Id.* The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. *Id.* If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for

discrimination. *Id.* The ultimate burden of persuasion remains at all times with the plaintiff. *Id.*

### 1.    Prima facie case

To establish a prima facie case of retaliation under the Rehabilitation Act, Plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) the exercise of the protected activity was known to his employer; (3) he suffered an adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there is a causal connection between the protected activity and the adverse employment action or severe harassment. *See Hunter v. Sec'y of U.S. Army,* 565 F.3d 986, 995-96 (6th Cir. 2009); *Morris v. Oldham Cnty. Fiscal Ct.,* 201 F.3d 784, 793-94 (6th Cir. 2000). Plaintiff's prima facie burden on a retaliation claim is a "low hurdle[,]" *Gribcheck*, 245 F.3d at 550, and the success of plaintiff's retaliation claim does not depend on the success of the underlying disability discrimination claim. *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).

Plaintiff states that he engaged in protected activity when he complained about Anaya's treatment of him in 2016, when he filed his EEO Complaint in January 2017, and over the remaining months when he amended his EEO charges regarding the alleged ongoing conduct (e.g., lost overtime, excessive escorts, continued

rescission of his weapon and credentials, etc.). (Pl.'s Resp. at pp. 26-27, PgID 1816-17.) Defendant does not dispute this.

Plaintiff next argues that Defendant knew about the protected activity because it appointed Streetman to investigate and participated in the EEO process. (Pl.'s Resp. at p. 27, PgID 1817.) Again, Defendant does not dispute this.

Plaintiff then contends that "as for adverse action, [he] was terminated." (Pl.'s Resp. at p. 27, PgID 1817.) Defendant does not dispute that Plaintiff's termination constitutes an adverse action, but does contend, as it did above, that the May 2017 written reprimand and the requests that Plaintiff undergo an FFDE are not adverse actions. (Def.'s Mot. at p. 26, PgID 158.) Plaintiff does not address this argument, and in his motion appears to limit the claimed adverse action for his retaliation claim to his termination. (See Pl.'s Resp. at p. 27, PgID 1817.)

Defendant focuses its argument on the fourth prong of the prima facie case – whether the protected activity and the adverse employment action are causally connected. (Def.'s Mot. at pp. 26-28, PgID 158-60.) For this prong, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity]." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted).

58

Defendant argues that Plaintiff may not establish causation based on temporal proximity <u>alone</u> because the "closest protected activity was the filing of [Plaintiff's] formal EEO complaint in January 2017" and "Plaintiff's weapon was removed and he was assigned to light duty in April 2017." (*Id.* pp. 26-27, PgID 158-59, citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'" citing cases where three months and four months were "insufficient."); and *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) ("because the disciplinary actions occurred two to five months after [the plaintiff] filed charges, and are fairly evenly spread over a period of time, the inference of a causal connection based on temporal proximity alone is tenuous ... [a]bsent additional evidence, this loose temporal proximity is insufficient to create a triable issue.").) Defendant argues that a four-month gap is "insufficient to create a causal connection based on temporal proximity alone." (*Id.* at pp. 27-28, PgID 159-60.)

In response, Plaintiff contends that the Streetman Report was issued in December 2016, he filed his EEO Complaint in January 2017, and he then "regularly amended the EEO complaint when adverse employment actions were taken against

59

him." (Pl.'s Resp. at p. 27, PgID 1817.) He further points out that he filed a second EEO charge regarding "the weapons/credentials decision," and then amended that Complaint based on subsequent actions, including his suspension for sleeping on duty and claimed lost overtime and position advancement opportunities. (*Id.* at pp. 27-28, PgID 1817-18.) Plaintiff concludes that he was "actively engaged in his protected activity when all adverse employment actions occurred[,]" and that he has sufficient causation to establish a prima facie case of retaliation. (*Id.*, relying on *Gribcheck*, 245 F.3d at 551 ("A plaintiff may demonstrate the causal connection by the proximity of the adverse employment action to the protected activity. Gribcheck showed that his litigation was ongoing at the time of his suspension, thereby establishing the fourth prong of his prima facie case.") (internal citation omitted). *But see Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020) (noting that "temporal proximity alone is generally not enough to establish the prima facie element of causation").

The Court will assume, without deciding, that Plaintiff has met the "low hurdle" for establishing a prima facie case of retaliation, and will proceed to the next stages of the *McDonnell Douglas* framework.

## 2.  Pretext

Defendant argues that Plaintiff fails to provide evidence that Defendant's stated reasons for the actions taken with regard to Plaintiff are pretextual and thus that any actions taken after his complaints were retaliatory. (Def.'s Mot. at p. 28, PgID 160.) Defendant contends that:

- The alleged harassment by coworkers predated Plaintiff's protected activity, and thus was not retaliatory.

- Plaintiff was given the opportunity to provide satisfactory medical documentation and avoid an FFDE. (Ex. 18, 4/6/17 Letter)

- Defendant reasonably rejected the inconsistent notes of Dr. Hopkins, and the DOL also rejected Dr. Hopkins notes/opinion. (Ex. 16, DOL letter)

- Plaintiff was found unfit for duty in reliance on an objectively reasonable individualized medical opinion. (Ex. 29, Im Report.)

- Defendant offered to reassign Plaintiff to a non-law enforcement position, which Plaintiff declined. (Ex. 37, 5/10/18 Letter.) As a result, Plaintiff's employment was terminated.

Defendant contends that there is simply no evidence of retaliation against Plaintiff for reporting harassment. (*Id.* at p. 28.)

61

In response, Plaintiff states that he relies on his arguments stated above in the disability discrimination discussion. (Pl.'s Resp. at p. 28, PgID 1818.)[6] However, as explained *supra*, the Court finds that Plaintiff has failed to show that any employment actions were taken other than for the stated legitimate nondiscriminatory reasons. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) ("'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity'") (citing *Wasek*, 682 F.3d at 472); *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) ("Although temporal proximity can demonstrate a causal connection for purposes of a prima facie case, it alone cannot establish pretext."). Plaintiff has failed

---

[6] Plaintiff also contends that there is a "false statement" in Defendant's brief. (Pl.'s Resp. at pp. 28-29, PgID 1818-19.) He challenges Defendant's statement that it "reasonably rejected the inconsistent notes of Dr. Hopkins, which were also rejected by the DOL," arguing that "Exhibit 16 does not show anywhere how the Department of Labor identified and rejected any purported inconsistencies in Dr. Hopkins' opinion." (*Id.*) However, Plaintiff misreads Defendant's motion. Defendant argued that *it* rejected the "inconsistent notes of Dr. Hopkins" and that Dr. Hopkins' notes were also rejected by the DOL. (Def.'s Mot. at p. 28, PgID 160.) Indeed, the DOL did state that Dr. Hopkins "did not provide a well rationalized opinion explaining how the diagnosed adjustment disorder with mixed anxiety and depression was caused by the actions and treatment" by Plaintiff's supervisor, and thus referred Plaintiff "for a Second Opinion evaluation by a Board Certified Psychiatrist." (Ex. 16, DOL Letter, PgID 741.) The DOL then found, "[b]ased on the report of Robert S. Burnstein, M.D." only that there was sufficient evidence to support Plaintiff's worker's compensation claim. (*Id.*) Defendant's statement in its brief therefore was not "false."

to present summary judgment evidence to refute Defendant's stated reasons for the employment actions; he merely denies them. A "blanket denial [of] the employer's articulated reasons … is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987). Accordingly, the Court grants Defendant summary judgment on Plaintiff's retaliation claim.

### D.    The MSPB Decision

Following Plaintiff's removal from federal service as a CBPO for medical inability to perform the essential functions of a CBPO, Plaintiff appealed his removal to the MSBP, and asserted the affirmative defenses of disability discrimination and retaliation for EEO activity. (Ex. 39, MSPB Decision, PgID 852.) The Administrative Judge ("AJ"), Erin Brandenburg, held a two-day hearing by video-teleconference on December 6-7, 2018, and then issued her decision on April 23, 2019, affirming the Agency's decision. (*Id.*) The AJ found that the Agency's decision to remove Plaintiff because of medical inability to perform his position is supported by a preponderance of the evidence. (*Id.* PgID 865-82.) The AJ further found that Plaintiff failed to prove his affirmative defenses of disability discrimination and retaliation by a preponderance of the evidence. (*Id.* PgID 882-

94.) Plaintiff now seeks judicial review of this MSPB Decision. (FAC ¶¶ 110-17, PgID 16.)

The Civil Service Reform Act of 1978 ("CSRA") permits a federal employee subjected to a particularly serious personnel action, such as discharge, to appeal the agency's decision to the MSPB. *See* 5 U.S.C. § 7702. The appeal may allege that the agency had insufficient cause for taking the personnel action under the CSRA, and may also charge the agency with discrimination prohibited by another federal statute, such as the Rehabilitation Act. *Id.* "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination, she is said … to have brought a 'mixed case.'" *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also Valentine-Johnson v. Roche*, 386 F.3d 800, 802 (6th Cir. 2004) ("A mixed case is one where a federal employee alleges that she suffered from an adverse agency action appealable to the [MSPB], and that the action was also based on discrimination."). If the MSPB upholds that personnel action, the employee can seek judicial review. *Kloeckner*, 568 U.S. at 45. In "mixed" cases, which include a claim of discrimination, judicial review must be sought in federal district court. 5 U.S.C. § 7703(b)(2); *Kloeckner*, 568 U.S. at 44.

Plaintiff and Defendant disagree on the standard of review to be employed by this Court in a "mixed case." Plaintiff contends that the Court reviews the MSPB

64

decision anew, de novo, without any deference given to the MSPB. (Pl.'s Resp. at p. 30, PgID 1820, citing *Perry v. MSPB*, 137 S. Ct. 1975, 1986-88 (2017).)[7] Defendant contends that judicial review of the MSPB decision on the personnel action (the "non-discrimination claim") is "on-the-record review for abuse of discretion" and that the discrimination claims are reviewed de novo. (Def.'s Mot. at p. 29, PgID 161, citing *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 472 (6th Cir. 2003).) Defendant is correct.

In *Seay v. Tennessee Valley Authority*, 339 F.3d 454 (6th Cir. 2003), the Sixth Circuit Court of Appeals addressed, in part, the issue of whether the district court retains jurisdiction of the nondiscrimination claim in a mixed case when the discrimination claim is dismissed. In *Seay*, the appeal to the district court was from the agency's EEO process, and not from the MSPB. *Id.* at 470. The Sixth Circuit noted that "[o]n-the-record review is required for nondiscrimination claims only if

---

[7] *Perry v. MSPB*, 137 S. Ct. 1975 (2017), addressed the issue of the proper forum for judicial review of "mixed cases" when the MSPB dismisses such a case for lack of jurisdiction, as opposed to dismissal on the merits. The Supreme Court held that, in such a case, the district court, not the Federal Circuit, is the proper forum for judicial review. *Id.* at 1979. The Supreme Court did not address the standard of review to be employed by the district court in such cases. However, the dissent recognized that "lower courts" have held that discrimination and non-discrimination claims are subject to distinct standards of review, with discrimination claims subject to de novo review and non-discrimination claims subject to review on the administrative record for abuse of discretion. *Id.* at 1990 (Gorsuch, J., dissenting) (citing *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 499 (1st Cir. 2007)).

the 'mixed case' complaint is appealed from the MSPB. In contrast, a 'mixed case' complaint from an agency's EEO process, on judicial review at a district court, is reviewed de novo." *Id.* at p. 472 (holding that the Court retained subject matter jurisdiction over the nondiscrimination claims, which would be reviewed de novo because the appeal was from the agency's EEO process). Accordingly, *Seay* supports Defendant's contention that judicial review of the nondiscrimination claim in this case (Plaintiff's termination) is on-the-record review for abuse of discretion, because the appeal is from the MSPB.

Other circuits that have addressed this issue have agreed that "in § 7703 'mixed cases' the district should try discrimination claims de novo but apply the arbitrary and capricious standard of § 7703(c) to review of all other claims brought before the MSPB." *See Kelliher v. Veneman*, 313 F.3d 1270, 1274-75 (11th Cir. 2002) (collecting cases); *see also Carr v. Reno*, 23 F.3d 525, 528 (D.C. Cir. 1994) ("We review de novo the MSPB's findings under the Rehabilitation Act, but we review findings under the Civil Service Reform Act on the administrative record under an arbitrary and capricious standard."); *Albert v. Holder*, No. 08-13289, 2009 WL 3424194, at *8 (E.D. Mich. Oct. 20, 2009) (Edmunds, J.) ("When bringing a mixed case in district court, the discrimination claim will be subject to de novo review, 'while the non-discrimination claim will be reviewed on the administrative

66

record created before the EEO office or the MSPB, subject to the arbitrary and capricious standard.'") (citing *Greenhouse v. Geren*, 574 F. Supp. 2d 57, 66 (D.D.C. 2008)). Thus, in such "mixed" cases, claims not related to discrimination are reviewed under the standard set forth in 5 U.S.C. § 7703(c), and the MSPB's decision is set aside only if its findings or conclusions are found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence[.]" 5 U.S.C. § 7703(c). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Plaintiff's discrimination and retaliation claims regarding his termination therefore are reviewed de novo, and are addressed, and denied, for the reasons set forth *supra*, at pages 33-63.

Plaintiff's remaining nondiscrimination claim – that that his termination was a prohibited personnel action – is subject to review for abuse of discretion. Plaintiff summarily asserts in his Response brief only that he is "entitled to a trial at least on the MSPB matter." (Pl.'s Resp. at p. 30, PgID 1820.) However, Plaintiff does not explain how the AJ erred in finding that Plaintiff was properly removed from his

position for Medical Inability to Perform the Essential Duties of a CPBO.

Accordingly, this argument is waived because it is perfunctory. *See Clemente v.*

*Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) (issues raised in a perfunctory manner are

deemed waived); *McPherson v. Kelley*, 125 F.3d 989, 995-96 (6th Cir. 1997)

("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived. It is not sufficient for a party to

mention a possible argument in the most skeletal way, leaving the court to … put

flesh on its bones.") (citation and quotation marks omitted).

Even assuming this argument was not waived, Defendant is still entitled to

summary judgment on this claim. As thoroughly discussed above, Plaintiff was

properly removed from his position for medical inability to perform the duties of his

CBPO position. The AJ conducted a hearing over two days after the parties had an

opportunity for discovery, heard live testimony from several witnesses, including

Plaintiff and Dr. Im, and was provided testimony from Dr. Hopkins and Dr.

Burnstein. (Ex. 7, MSPB Tr. I; Ex. 2, MSPB Tr. II; Ex. 43, Burnstein Dep.) The AJ

weighed the evidence and gave detailed reasons for the weight she assigned to each

opinion, and upheld the termination decision. (Ex. 39, MSPB Decision.) Plaintiff

has not demonstrated any error in the well-reasoned opinion of the AJ. The Court

therefore grants Defendant's motion for summary judgment with respect to this claim.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's motion for summary judgment and **DISMISSES** Plaintiff's Amended Complaint **WITH PREJUDICE**.

The Court further **ORDERS** the Clerk of Court to amend the docket for this case to reflect the proper Defendants. The caption shall read: "Nicholas Kabrovich v. Alejandro Mayorkas, Secretary of Homeland Security, and Troy Miller, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection."

IT IS SO ORDERED.


Dated: March 8, 2021                              s/Paul D. Borman
                                                  Paul D. Borman
                                                  United States District Judge